# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

NAREATHA L. STUDDARD,     )
     )
     Plaintiff,     )
     )
v.     )     Case No.: 5:15-cv-1313-LCB
     )
ALABAMA AGRICULTURAL &     )
MECHANICAL UNIVERSITY, et al.,     )
     )
     Defendants.

## MEMORANDUM OPINION AND ORDER

Plaintiff Nareatha L. Studdard – a former associate professor at Alabama Agricultural & Mechanical University ("Alabama A&M") – alleges that she was retaliated against for exercising rights guaranteed by the Family and Medical Leave Act of 1993 ("FMLA"). In particular, plaintiff claims that she suffered an adverse employment action when certain defendants refused to forward her 2012 tenure application for review, when it would have been evaluated under less stringent standards, and simultaneously requested an extension of her probationary period. Plaintiff alleges this action caused her to have to submit her tenure application the next year, when it was subjected to more stringent criteria, and that this resulted in the denial of tenure and ultimately her termination from Alabama A&M.

As described in more detail below, the remaining defendants in this action filed a Motion for Summary Judgment (doc. 112), along with a supporting brief and evidentiary submission.  Plaintiff filed a response (doc. 123), which the Court ordered plaintiff to reformat (see doc. 133 (reformatted response)).  The remaining defendants then filed a reply (doc. 129).  Therefore, the Motion for Summary Judgment is ready for review.  For the reasons discussed in this memorandum opinion, the Court will grant the Motion for Summary Judgment.

## I.  BACKGROUND

Plaintiff initiated this action on August 5, 2015, against several defendants. (Doc. 1).  Plaintiff later amended her complaint (doc. 79).  Plaintiff's amended complaint alleges one count of FMLA retaliation.  Plaintiff appears to bring this count against defendants (1) Alabama A&M; (2) the Board of Trustees of Alabama A&M (the "Board"); (3) former governor and president of the Board, Robert Bentley ("Bentley") in his official capacity; (4) individual members of the Board Kevin Ball, Ginger Harper, John O. Hudson, III, James D. Montgomery, Sr., Dr. Hattie N. Myles, Chris Robinson, Andre Taylor, Velma J. Tribue, and Dr. Jerome Williams in their official capacities (collectively, "the Trustees"); (5) provost and vice president for Academic Affairs, Dr. Daniel Wims ("Dr. Wims"), in his official and individual capacity; (6) president of Alabama A&M, Dr. Andrew Hugine, Jr. ("Dr. Hugine"), in his official and individual capacity; (7) dean of the College of

Business and Public Affairs, Dr. Delmonize Smith ("Dr. Smith"), in his official capacity and as successor to the former dean, Dr. Amin Sarkar; and (8) the chairman of the Department of Management, Marketing, and Logistics[1], Larry McDaniel ("Dr. McDaniel"), in his individual and official capacity. (Doc. 79, pp. 2-3).[2]

Following the filing of the amended complaint, several motions to dismiss (docs. 80 and 81) were filed. Before the Court addressed the motions to dismiss, plaintiff voluntarily dismissed Bentley and the Trustees. (Docs. 85, 86). On March 31, 2017, the Court issued a memorandum opinion (doc. 91) addressing one of the motions to dismiss (doc. 80); the other motion to dismiss (doc. 81) was denied as moot.[3] In particular, the Court dismissed Alabama A&M, the Board, and Dr. Hugine, Dr. Wims, and Dr. McDaniel in their individual capacities. (*Id*. at 20). The Court denied the motion to dismiss (doc. 80) to the extent that it requested dismissal of the official-capacity claims against Dr. Hugine, Dr. Wims, Dr. Smith, and Dr. McDaniel for injunctive relief. (*Id*.). Therefore, at this juncture, the

---

[1] The Department of Management, Marketing, and Logistics was formerly known as the Department of Management and Marketing.

[2] The Court says "appears" to bring this count against these defendants because, while plaintiff lists these defendants at the beginning of her amended complaint, the heading of Count One – the only count in the amended complaint – lists as defendants (1) Dr. Hugine, Dr. Wims, and Dr. McDaniel in their official and individual capacities; and (2) Bentley, Smith (as successor to Sarkar), and the Trustees, in their official capacities only. (Doc. 79, p. 14).

[3] This action was reassigned to the undersigned on October 26, 2018.

FMLA retaliation claim exists against Dr. Hugine, Dr. Wims, Dr. Smith, and Dr. McDaniel in their official capacities solely for injunctive relief. The Court will refer to these three defendants as "the remaining defendants."

With respect to the following facts, the Court accepts, as true, any fact not expressly disputed by either party. (Doc. 131; Doc. 133, p. 7 n.1); Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if . . . there is no genuine dispute as to any material fact . . . .").

### A.     Plaintiff begins her employment at Alabama A&M

From 2004 to 2009, plaintiff was employed as an assistant professor at Arkansas State University. (Doc. 79, p. 7; Doc. 112-10, p. 23 (Studdard Dep., p. 88, lines 4-10); Doc. 124-18, p. 25 (Studdard Aff., Ex. A)). In late 2008 or early 2009, plaintiff ran into Dr. McDaniel, who had been a professor of hers while she was a student at Alabama A&M, at a continuing education event. (Doc. 124-18, p. 11 (Studdard Aff., ¶ 27)). Dr. McDaniel encouraged plaintiff to apply for an associate professor opening in his department at Alabama A&M. (*Id*.). Dr. McDaniel was (and still is) the chair of the Department of Management, Marketing, and Logistics in the College of Business at Alabama A&M. (Doc. 112-1, p. 13; Doc. 112-17, p. 2 (McDaniel Aff. ¶ 2)). As a result of her encounter with Dr. McDaniel, plaintiff applied for the position at Alabama A&M and was

appointed as an associate professor, a tenure track position, in August 2009. (Doc. 79, p. 7; Doc. 112-1, p. 12; Doc. 112-10, p. 72 (Studdard Dep., p. 282, lines 8-11)).

At the time that plaintiff applied for the position at Alabama A&M, she knew that she would not be approved for tenure at Arkansas State University. (Doc. 112-10, p. 24 (Studdard Dep., p. 91, lines 7-16)). Plaintiff has testified that, in prior years at Arkansas State University, she had been on track for tenure; however, in her fourth year, she received notification that she was not on track for tenure. (Doc. 112-10, p. 25 (Studdard Dep., p. 94, lines 6-14)). Plaintiff states that this was not the reason that she applied for the position at Alabama A&M. Rather, plaintiff wanted to teach at a historically black university and be closer to her mother, among other things. (Doc. 112-10, p. 28 (Studdard Dep., p. 106, line 10 – p. 107, line 7)).

## B. Description of remaining defendants

Dr. Hugine is the president of Alabama A&M and has been in that position since July 2009. (Doc. 79, p. 6; Doc. 112-1, pp. 12-13). Dr. Hugine is responsible for making the final decision with respect to granting tenure to faculty members. (Doc. 112-1, p. 13; Doc. 112-10, p. 16 (Studdard Dep., p. 59, lines 17-20)).

Dr. Wims is the provost and vice president for Academic Affairs and Research. (Doc. 112-1, p. 13). Dr. Wims has been in that position since April 2010. (Doc. 112-15, p. 2 (Wims Aff., ¶ 2)). Dr. Wims provides administration

oversight for the divisions of Academic Affairs and Research at Alabama A&M. (Doc. 112-1, p. 13; Doc. 112-15, p. 2 (Wims Aff., ¶ 3)). Part of Dr. Wims's duties includes reminding faculty members of their deadlines to apply for tenure. (Doc. 112-1, p. 13; Doc. 112-15, pp. 2-3 (Wims Aff., ¶ 3); Doc. 112-10, p. 21 (Studdard Dep., p. 79, lines 11-16)). Dr. Wims also provides recommendations to Dr. Hugine regarding whether tenure applicants should receive tenure. (Doc. 112-1, p. 13; Doc. 112-15, pp. 2-3 (Wims Aff., ¶ 3); Doc. 112-10, p. 19 (Studdard Dep., p. 71, lines 8-15)). Dr. Wims was not plaintiff's direct supervisor. (Doc. 112-10, p. 22 (Studdard Dep., p. 82, lines 2-5)).

Dr. McDaniel is the chair of the Department of Management, Marketing, and Logistics in the College of Business. (Doc. 112-1, p. 13; Doc. 112-17, p. 2 (McDaniel Aff., ¶ 2)). Dr. McDaniel's responsibilities include providing evaluations of faculty members and participating in the submission of tenure materials for faculty members in his department. (Doc. 112-1, p. 14; Doc. 112-17, pp. 2-3 (McDaniel Aff., ¶ 3)).

Dr. Smith is the current dean of the College of Business and Public Affairs. (Doc. 79, ¶ 9; Doc. 112-1, p. 14). Dr. Smith's predecessor was Dr. Sarkar, who was, as described below, involved in some of the events at issue in this lawsuit. (*Id.*).

**C.      2003 Faculty Handbook and 2011 Faculty Handbook**

When plaintiff was hired at Alabama A&M, the 2003 Faculty Handbook was in effect.  (Doc. 112-10, p. 68 (Studdard Dep., p. 267, lines 2-22)).  Under the 2003 Faculty Handbook, a person appointed as an associate professor would serve a probationary term of three academic years.  (Doc. 112-15, pp. 40, 60 (Wims Aff., Ex. 1)).  The 2003 Faculty Handbook stated that a faculty member may submit an application for tenure in the fall semester of the final year of the required period for a certain rank.  (Doc. 112-15, p. 61 (Wims Aff., Ex. 1)).  Thus, it appears that an associate professor would apply for tenure in the fall of the third year of his or her probationary period.  The probationary period could be extended upon written justification requested by the dean and department chair and approved by the vice president for Academic Affairs.  (Doc. 112-15, p. 60 (Wims Aff., Ex. 1)).  If tenure was denied, then the faculty member would be given a one-year notice of termination of service.  (Doc. 112-15, p. 61 (Wims Aff., Ex. 1)).  The requirements for tenure under the 2003 Faculty Handbook were as follows:

> A. Letter of application
>
> B. At least two letters of recommendations from immediate supervisors, chair, and dean.
>
> C. Current curriculum vita.
>
> D. Verification of years of service by the Office of Human Resources.

E. A minimum of last three years of continuous membership in a professional society in discipline.

F. Teaching Portfolio Containing:

1. Course outlines, faculty evaluations, student evaluations for all courses taught.

2. Development of innovative pedagogical methods and materials, new courses, major revisions in old courses, etc.

3. Professional development to enhance teaching effectiveness.

*G. Scholarly Activities*

*Publication in refereed journals, scholarly books, chapters in scholarly books, research reports, attendance at scientific/professional meetings, reviewer for journal, proposals, creative works, etc. related to the discipline.*

**Service**

*Evidence of*: Service to the university by being member/chair of various committees, any administrative role at the university. Chair of graduate thesis dissertation committees, service on student advisory committees, service as a mentor for students/research.
*Evidence of*: Service to the public and community.

(Doc. 112-15, pp. 61-62 (Wims Aff., Ex. 1) (emphasis added)).

The 2003 Faculty Handbook was later amended and became the 2011 Faculty Handbook. Under the 2011 Faculty Handbook, the probationary term for an associate professor was increased to four academic years. (Doc. 112-16, pp. 45,

74 (Wims Aff., Ex. 2)).  By April 1st of the third probationary year, the Office of Academic Affairs would notify the candidate of the requirement to apply for tenure in the next academic year.  (Doc. 112-16, pp. 45-46 (Wims Aff., Ex. 2)).  According to the 2011 Faculty Handbook, "[f]aculty not recommended for tenure [would] be notified that their next year will be their terminal year." (Doc. 112-16, p. 46 (Wims Aff., Ex. 2)).  Similar to the 2003 Faculty Handbook, the probationary period could be extended upon written recommendation and justification by the dean and the department chair and approved by the provost and vice president of Academic Affairs.  (Doc. 112-16, p. 74 (Wims Aff., Ex. 2)).

The requirements for the 2011 Faculty Handbook were as follows:

A.   A Letter of Application;

B.   At least two letters of recommendation from immediate supervisors (*i.e.*, chair and dean);

C.   The weights given to each of the three areas of faculty responsibility (teaching, research and service (extension);

D.   A current curriculum vitae;

E.   Verification of years of service and probationary period by the Office of Human Resources;

F.   Documentation of continuous membership in a professional learned society to include the last three years at a minimum;

G.   Teaching/Advisement Portfolio containing:

1. Course syllabi reflecting student learning outcomes and course objectives, faculty evaluations, and student evaluations for all courses taught from the last three years;

2. Demonstration of the use of innovative pedagogical methods and materials such as development of new courses, infusion of technology into the instructional program, major revision and updating of courses to reflect changes in the field;

3. Attendance at professional development activities designed to improve teaching effectiveness;

4. Successful student advisement and mentoring practices;

5. Assessment of student learning and efforts to modify courses based on these results;

H. *A minimum of three (3) scholarly products (refereed, juried and/or peer reviewed) and/or competitively funded grants, where the applicant is Primary Author or Primary Investigator within the probationary period. Scholarly activities include publications in professional and refereed journals, scholarly books, chapters in scholarly books, presentations at scientific/professional meetings, funded research projects, juried creative works, and other activities related to high performance in one's discipline. Evidence of peer-reviewed editorial policy for each of the papers must be provided. If the work is creative, evidence is required to show they were juried or highly significant in the field of endeavor.*

I. Evidence of having made a contribution to the University through service as outlined in 4.2.2.3. This may include but is not limited to serving as a member or as chair of various committees or in any administrative role at the University, chairing of graduate thesis/dissertation committees, and serving on student advisory committees or as a mentor for student research.

(Doc. 112-16, pp. 78-79 (Wims Aff., Ex. 2) (emphasis added)).

On their face, the requirements for scholarly activities in the 2011 Faculty Handbook are not the same as the 2003 Faculty Handbook. Dr. Wims, however, has testified that there were no substantive changes in tenure criteria between the 2003 Faculty Handbook and the 2011 Faculty Handbook; rather, he states that the "sole purpose of the revisions to the tenure requirements in the 2011 Handbook was to clarify the practices that were ongoing under the 2003 Handbook." (Doc. 112-15, p. 3 (Wims Aff., ¶¶ 6-8)). In particular, Dr. Wims asserts that the 2011 Faculty Handbook did not impose a new requirement of three scholarly products in order for a faculty member to obtain tenure. (Doc. 112-15, pp. 3-4 (Wims Aff., ¶ 7)). Rather, according to Dr. Wims, Alabama A&M had always, in practice, required at least three scholarly products as a requisite for tenure under the 2003 Faculty Handbook. Dr. Wims states that the 2011 Faculty Handbook merely codified this practice. (*Id*.). Dr. Wims also asserts that the 2011 Faculty Handbook clarified the requirement that the three scholarly products be created within the designated probationary period. (Doc. 112-15, p. 4 (Wims Aff., ¶ 8)). Dr. Wims testified that the Faculty Senate would not approve any substantive changes to the 2003 Faculty Handbook. (*Id*.). According to Dr. Wims, it was verbally agreed among the Board, the faculty handbook committee, and the faculty senate that the 2003 Faculty Handbook tenure criteria would remain in effect from May 2012 until the beginning of the next academic year, and the 2011 Faculty

Handbook would be fully implemented in August 2013. (Doc. 112-3, pp. 6-7 (Wims Dep., p. 18, 12 – p. 21, line 23)). However, no other evidence is provided in support of Dr. Wims's assertions.

### D. Plaintiff's FMLA leave and return to work

Plaintiff became pregnant in 2011 and had her first child in November 2011. (Doc. 124-18, p. 15 (Studdard Aff., ¶ 46)). Plaintiff testified that Dr. McDaniel exhibited a negative change in attitude toward her after she became pregnant. (Doc. 124-18, p. 14 (Studdard Aff., ¶ 45)). In particular, plaintiff alleges that Dr. McDaniel abruptly changed a class schedule so that it would begin at 7 p.m. instead of 4 or 5 p.m. (*Id*.). This caused plaintiff to walk back to her vehicle alone in the dark after the class ended at 10 p.m. (*Id*.).

Plaintiff took medical leave pursuant to the FMLA from November 2011 to early January 2012 due to pregnancy and delivery complications. (Doc. 112-1, p. 15; Doc. 112-10, p. 60 (Studdard Dep., p. 235, lines 13-16)). Plaintiff was hospitalized three times during this time. (Doc. 112-10, p. 81 (Studdard Dep., p. 317, line 12 – p. 319, line 12)). Plaintiff asserts that shortly after she returned to work, on January 4, 2012, she was required to attend a QEP mandatory workshop. (Doc. 124-18, p. 15 (Studdard Aff., ¶ 47)). Plaintiff states that, while she attended the morning session of the mandatory workshop, she was unable to attend the entire day due to her continuing recuperation. (*Id*.). Plaintiff further asserts that,

although she informed Dr. McDaniel's office of her absence, she was later reprimanded by then-dean, Dr. Sarkar; that reprimand went into her personnel file. (*Id*.; Doc. 124-7, p. 1 (Pl. Ex. 7)).  Although plaintiff returned to work in early January 2012, she testified that she was still recovering from her medical issues and that she started to re-emerge as a researcher around 2013, which is when she tried "to get things back in place."  (Doc. 112-10, p. 79 (Studdard Dep., p. 310, lines 1-16)).

Plaintiff also describes some issues with respect to her annual faculty evaluations, described in more detail in the next section.

### E.  Plaintiff's 2011-2012 evaluation

Dr. McDaniel completed a 2011-2012 faculty evaluation of plaintiff, which covered August 2011 to May 2012.  (Doc. 112-14 (Studdard Dep., Ex. 12)). Plaintiff's numerical score fell into the "Exceptional" category in the 2011-2012 evaluation.  (Doc. 112-12, p. 34 (Studdard Dep., Ex. 12)).  On the 2011-2012 evaluation, Dr. McDaniel hand wrote, "Encourage publications."  (Doc. 112-10, p. 78 (Studdard Dep., p. 308, lines 1-7); Doc. 112-14, p. 34 (Studdard Dep., Ex. 12)). Plaintiff understood this to mean that Dr. McDaniel wanted a publication.  (Doc. 112-10, p. 80 (Studdard Dep., p. 314, lines 8-13)).  Plaintiff also testified that Dr. McDaniel generally encouraged faculty members to publish.  (Doc. 112-10, p. 77 (Studdard Dep., p. 303, lines 15-22)).

Dr. McDaniel also hand wrote on the 2011-2012 evaluation that plaintiff had "not attended conference as agreed upon as a goal for 2012-2013." (Doc. 112-17, p. 13 (McDaniel Aff., Ex. 3)). Plaintiff asserts that this particular comment was added by Dr. McDaniel without her knowledge, and that it was a requirement not even in existence during the 2011-2012 time period which the evaluation covered. (Doc. 124-18, pp. 15-16 (Studdard Aff., ¶ 48)).

**F.    Plaintiff's probationary period is extended**

On May 18, 2012, Dr. Wims sent plaintiff a memorandum reminding her that she was "to apply for tenure this upcoming academic year 2012-2013." (Doc. 112-2, p. 15; Doc. 112-16, p. 155 (Wims Aff., Ex. 3)). The memorandum stated that "while the promotion/tenure processes will follow those outlined in the 2011 Faculty Handbook, your dossier will be evaluated based upon the criteria in the 2003 Faculty Handbook." (*Id.*; Doc. 112-10, p. 14 (Studdard Dep., p. 49, lines 2-10)). The memorandum stated that the tenure application was to be submitted to the department chairperson (*i.e.*, Dr. McDaniel), by September 7, 2012. (Doc. 112-1, p. 16; Doc. 112-16, p. 155 (Wims Aff., Ex. 3)).

Plaintiff testified that she submitted her first application for tenure in the fall of 2012. (Doc. 112-10, p. 39 (Studdard Dep., p. 151, lines 14-17)). Plaintiff, however, could not remember who she left it with, whether she left it at Dr. McDaniel's office, or whether Dr. McDaniel ever reviewed it. (Doc. 112-10, p. 56

(Studdard Dep., p. 218, line 3 – p. 221, line 5)). The remaining defendants deny that plaintiff submitted a 2012 tenure application. In particular, Dr. McDaniel testified that he never received an application from plaintiff in the fall of 2012. (Doc. 112-6, p. 6 (McDaniel Dep., p. 17, lines 9-16)). Dr. Wims also attested that plaintiff did not apply for tenure in the 2012-2013 academic year. (Doc. 112-15, p. 5 (Wims Aff., ¶ 11). Regardless, it is undisputed that plaintiff's 2012 tenure application did not proceed through the normal tenure review process. (*See* Doc. 112-10, p. 63 (Studdard Dep., p. 247, line 22 through p. 248, line 3) (testifying that promotion and tenure review committee never reviewed her 2012 tenure application)). Instead, the probationary period for plaintiff, *i.e.*, the period in which a tenure-track applicant can apply for tenure, was extended to August 2013.[4] The parties dispute, however, how this extension came to fruition.

Dr. McDaniel testified that during a meeting in 2012 with plaintiff, he discussed with her whether she should apply for tenure that academic year. (Doc. 112-6, p. 6 (McDaniel Dep., p. 17, line 17 – p. 18, line 20); Doc. 112-7, p. 3 (McDaniel Aff., ¶ 5)). Dr. McDaniel stated that he offered to seek a one-year extension of plaintiff's probationary period on her behalf, something that he thought plaintiff appeared to be very appreciative of. (*Id.*). In other words, Dr.

---

[4] As discussed in more detail below, there are two letters in the record that were sent in the fall of 2012 that request an extension of plaintiff's probationary period: one that requests until an extension until August 2013 and one that requests an extension until July 2014. Based on the undisputed facts in evidence, the Court assumes that the request to extend plaintiff's probationary term to August 2013 was the request that was granted.

McDaniel claims that it was plaintiff's decision whether to submit a 2012 tenure application or to take him up on his offer to request an extension of her probationary period. (*Id*.). Dr. McDaniel claims that his offer to request the extension was because of his concern regarding plaintiff's lack of scholarly productivity. (*Id*.). Dr. McDaniel further claims that he offered to seek the one-year extension on plaintiff's behalf so that she could engage in scholarly activities to bolster her tenure application. (*Id*.).

On the other hand, plaintiff testified that, after she received the May 18, 2012, memorandum from Dr. Wims, she had a meeting with Dr. McDaniel and Dr. Sarkar; in that meeting, plaintiff stated that she was told that her 2012 tenure application was going to be held back, and she had no choice in the matter. (Doc. 112-10, p. 57 (Studdard Dep., p. 222, lines 1-13, p. 223, lines 4-18); Doc. 124-18, p. 4 (Studdard Aff., ¶ 9)). Plaintiff told them that she wanted her application to go forward anyway. (Doc. 112-10, p. 57 (Studdard Dep., p. 222, line 10)). This meeting occurred approximately nine months after plaintiff's FMLA leave. (Doc. 112-10, p. 67 (Studdard Dep., p. 22, lines 17-23)).

On October 11, 2012, Dr. McDaniel and Dr. Sarkar sent a letter to Dr. Wims requesting that the "probationary period [for plaintiff] be extended to July 2014." (Doc. 112-10, pp. 80-81 (Studdard Dep., p. 316, line 14 through p. 317, line 11); Doc. 112-17, p. 7 (McDaniel Aff., Ex. 1)). The letter further stated, "The

justification for this request is that [plaintiff] encountered some medical complications during her pregnancy which resulted in an extended hospital stay medical leave. Your favorable response [to] this [sic] this request would be greatly appreciated." (*Id.*).

In a letter dated October 22, 2012, Dr. Wims requested "documentation, in reference to medical complications that was listed as justification in" the October 11, 2012, letter requesting an extension of plaintiff's probationary period until July 2014. (Doc. 112-1, p. 17; Doc. 112-16, p. 158 (Wims Aff., ¶ 11, Ex. 4). Plaintiff submitted the requested documentation. (Doc. 112-16, p. 160 (Wims Aff., ¶ 5)).

The Court pauses to note that there is another letter in the record dated November 30, 2012, that Dr. McDaniel and Dr. Sarkar sent to Dr. Wims. The November 30, 2012, letter requested that the probationary period of [plaintiff] . . . be extended to *August 2013*." (Doc. 112-10, p. 81 (Studdard Dep., p. 320, lines 5-22); Doc. 112-14, p. 43 (Studdard Dep., Ex. 15) (emphasis added)). The letter further stated, "The justification for this request is that [plaintiff] encountered some medical complications during her pregnancy, which resulted in an extended hospital stay and medical leave." (*Id.*). Plaintiff understood that when she received the November 30, 2012, letter, she would be given additional time to apply for tenure. (Doc. 112-10, p. 82 (Studdard Dep., p. 321, lines 12-16)). It is not clear from the record, however, why there were two letters from Dr. McDaniel

and Dr. Sarkar in the fall of 2012 requesting an extension of plaintiff's probationary period for that year, nor do the parties explain this discrepancy. Additionally, the parties cite to the letters interchangeably, essentially treating them as one letter requesting that the probationary period of plaintiff be extended. Consequently, the Court will do the same and, based on the undisputed facts in the record, assumes that plaintiff's probationary period was extended for one-year, or until August 2013, as described in more detail below.

On December 4, 2012, Dr. Wims sent a memorandum to plaintiff informing her that the request to extend her probationary period was approved. (Doc. 79, ¶ 24; Doc. 112-1, p. 17; Doc, 112-16, p. 12 (Wims Aff., Ex. 6)). The December 4, 2012, memorandum informed plaintiff that she was to apply for tenure by September 6, 2013. (*Id.*). The December 4, 2012, memorandum also noted that "the promotion/tenure processes will follow those outlined in the 2011 Faculty Handbook, and **your dossier will be evaluated based upon the stated criteria in the 2011 Faculty Handbook**." (*Id.*) (emphasis in original)).

## G. Plaintiff's 2012-2013 evaluation

Plaintiff's next evaluation for the next year, the 2012-2013 evaluation, covered the time period from August 2012 to May 2013. (Doc. 112-14, p. 22 (Studdard Dep., Ex. 11)). When it came time for her 2012-2013 evaluation, plaintiff testified at her deposition that she met with Dr. McDaniel about it, and

they agreed to the scoring on it. (Doc. 112-10, p. 67 (Studdard Dep., p. 297, line 13 – p. 298, line 11)). Plaintiff admits that after this meeting, Dr. McDaniel informed her that another meeting was warranted to assess her 2012-2013 evaluation; however, plaintiff objected to the meeting, and it did not occur. (Doc. 112-10, p. 87 (Studdard Dep., p. 343, lines 4-14); Doc. 112-14, p. 67 (Studdard Dep., Ex. 23)).

Plaintiff further testified that, after their initial meeting where they agreed to a score, Dr. McDaniel later downgraded her score without discussing it with her, causing her overall rating to go from "Exceptional" to "Above Average." (Doc. 112-10, pp. 76-77 (Studdard Dep., p. 298, line 2 through p. 17)). As a result, plaintiff wrote on the 2012-2013 evaluation that Dr. McDaniel had "updated & changed Sep 2013." (Doc. 112-14, p. 22 (Studdard Dep., Ex. 11)). The absence of a publication was noted in the 2012-2013 evaluation by Dr. McDaniel. In particular, the 2012-2013 evaluation stated that plaintiff had not met her 2012-2013 goal and had not published articles any since 2011. (Doc. 112-14, p. 27 (Studdard Dep., Ex. 11)).

Plaintiff alleges that Dr. McDaniel never provided her with a copy of her 2012-2013 evaluation to be submitted with her 2013 tenure application. (Doc. 79, ¶¶ 29-3; Doc. 124-18, p. 19 (Studdard Aff., ¶ 58)). Plaintiff testified that, following this event, she drafted a memorandum of record, which addressed the

2012-2013 evaluation by Dr. McDaniel, as well as the alleged withholding of her 2012 tenure application by Dr. McDaniel and then-dean Sakar.  (Doc. 124-8, pp. 1-2 (Pl. Ex. 8); Doc. 124-18, p. 19 (Studdard Aff., ¶ 59)).

Dr. McDaniel, on the other hand, testified that he and plaintiff met about her 2012-2013 evaluation, but that he disagreed with her self-evaluation and therefore he made changes to the 2012-2013 evaluation.  (Doc. 112-6, pp. 11-12 (McDaniel Dep., p. 40, line 18 – p. 41, line 13)).  Dr. McDaniel testified that a time or two plaintiff did not come back to retrieve her final evaluation.  (Doc. 112-6, p. 11 (McDaniel Dep., p. 39, lines 2-19)).

### H.    Plaintiff's 2013 tenure application

Plaintiff applied for tenure in fall of 2013 (*i.e.*, for the 2013-2014 academic year) by submitting it to the Promotion and Tenure Committee of the College of Business and Public Affairs.  (Doc. 112-10, p. 64 (Studdard Dep., p. 250, line 21 - p. 251, line 6); Doc. 124-18, p. 19 (Studdard Aff., ¶ 60); *see also* Doc. 112-16, p. 165 (Wims Aff., Ex. 7) (correspondence dated November 21, 2013, acknowledging receipt of tenure application from plaintiff)).  In a memorandum dated October 11, 2013, all members of the Promotion and Tenure Committee of the College of Business and Public Affairs recommended plaintiff for tenure.  (Doc. 112-10, p. 64 (Studdard Dep., p. 251, line 10 through p. 252, line 1); Doc. 124-9, p. 1 (Pl. Ex. 9); Doc. 124-18, p. 7 (Studdard Aff., ¶ 17)).  The Promotion and Tenure Committee of

the College of Business and Public Affairs did note, however, that plaintiff did not have a letter of recommendation from her department chair, *i.e.*, Dr. McDaniel. (Doc. 124-9, p. 2 (Pl. Ex. 2)). Dr. McDaniel testified that plaintiff did not submit the 2013 tenure application to him, and therefore he did not make a recommendation; however, if he had received the 2013 tenure application, he would not have recommended plaintiff for tenure. (Doc. 112-6, pp. 11, 14 (McDaniel Dep., p. 37, lines 17-22 and p. 52, lines 9-23)).[5] Additionally, in a letter to the Promotion and Tenure Committee dated October 15, 2013, Dr. Jones, the interim dean, stated that she supported plaintiff's application for tenure. (Doc. 124-10, p. 1 (Pl. Ex. 10)).

The recommendation by the Promotion and Tenure Committee of the College of Business and Public Affairs was then sent to the university-wide Promotion and Tenure Committee. (Doc. 112-10, p. 64 (Studdard Dep., p. 252, lines 2-9)). The Promotion and Tenure Committee did not recommend plaintiff for tenure. (Doc. 112-10, p. 65 (Studdard Dep., p. 254, lines 8-12); Doc. 112-16, p. 169 (Wims Aff., Ex. 8)). The memorandum documenting this decision stated that

---

[5] On September 20, 2013, Dr. McDaniel sent a letter to Dr. Barbara Jones, interim dean of the College of Business and Public Affairs, requesting that plaintiff's probationary period be extended to August 2014 due to medical complications in her pregnancy which resulted in an extended hospital stay and medical leave in 2012. (Doc. 112-17, pp. 4-5 (McDaniel Aff., ¶ 10)). Dr. McDaniel testified that he made this request so that plaintiff would have the opportunity to obtain tenure. (*Id*.). Dr. McDaniel stated that he did not hear from plaintiff regarding this second request for an extension of her probationary period; instead, he became aware that she had submitted her 2013 tenure application to Dr. Jones without submitting it to him. (*Id*.).

the reason for denying plaintiff tenure was for "insufficient number of publications." (Doc. 112-16, p. 169 (Wims Aff., Ex. 8)). The memorandum cited the 2011 Faculty Handbook requirement that a candidate have a minimum of three scholarly products where the tenure applicant is primary author or investigator and noted that plaintiff only had one peer-reviewed publication. (*Id.*).

Dr. Wims then reviewed plaintiff's 2013 application for tenure and also did not recommend her for tenure. (Doc. 112-10, p. 65 (Studdard Dep., p. 254, lines 13-17); Doc. 112-15, p. 6 (Wims Aff., ¶ 14 and Ex. 9)). A memorandum documenting Dr. Wims's review and decision is in the record. It states that plaintiff provided evidence of two peer reviewed scholarly products, one refereed journal article and one peer reviewed conference presentation as first author. (Doc. 112-16, pp. 6, 179 (Wims Aff., ¶ 14 and Ex. 9)). It further stated that the rationale for denial of tenure was lack of refereed, juried, and/or peer reviewed scholarly productivity as first author during the probationary period. (*Id.*).

The final decision with respect to plaintiff's 2013 tenure application was then left to Dr. Hugine. (Doc. 112-5, p. 5 (Hugine Dep., p. 13, lines 7-22)). Dr. Hugine testified that he reviews the recommendations from the Promotion and Tenure Committee and Dr. Wims, and if there is concurrence between the two, he also concurs with the recommendation. (*Id.*). Ultimately, Dr. Hugine did not approve plaintiff for tenure. (Doc. 112-10, p. 65 (Studdard Dep., p. 254, lines 18-

21); Doc. 112-16, p. 182 (Wims Aff., Ex. 10)).  In a letter dated March 27, 2014, plaintiff was notified that her application for tenure had been denied "based on lack of sufficient juried, peer reviewed and/or refereed scholarly productivity as first author during the probationary period."  (Doc. 112-16, p. 182 (Wims Aff., Ex. 10)).  As a result, the letter stated that the 2014-2015 academic year would be plaintiff's last at Alabama A&M.  (*Id*.).

Plaintiff appealed the final tenure decision made by Dr. Hugine.  (Doc. 112-10, pp. 65, 83 (Studdard Dep., p. 254, line 22 - p. 255, line 1 and p. 327, line 20 - p. 328, lines 14); Doc. 112-14, p. 56 (Studdard Dep., Ex. 19)).  Specifically, in a letter dated April 18, 2014, plaintiff wrote to Dr. Hugine, seeking reconsideration of the tenure decision.  (Doc. 112-16, p. 184 (Wims Aff., Ex. 11)).  In the April 18 letter, plaintiff asserted, among other things, that her tenure application should have been evaluated under the criteria set forth in the 2003 Faculty Handbook, not the 2011 Faculty Handbook.  (*Id*.).

In response to plaintiff's appeal, Dr. McDaniel wrote a letter to Dr. Wims.  (Doc.112-6, p. 18 (McDaniel Dep., p. 67, line 19 – p. 21); Doc. 124-13 (Pl. Ex. 13)).  In that letter, Dr. McDaniel responded to plaintiff's appeal and listed reasons why he did not support her application for tenure.  (*Id*.).  Dr. McDaniel testified that he did so to correct inaccuracies in plaintiff's April 18 letter.  Doc. 112-6, p. 19 (McDaniel Dep., p. 71, lines 2-9)).  Dr. Wims did not request that Dr. McDaniel

write this letter, and it appears that this was not the normal course of action. (*Id.*; *see also* Doc. 112-3, p. 16 (Wims Dep., p. 57, line 20 - p. 58, line 7)). Dr. Wims does not recall receiving this letter, however, and it was not forwarded to the Tenure and Promotion Appeals Committee. (Doc. 112-3, p. 11 (Wims Dep., p. 37, line 19 – p. 38, line 5 and p. 39, lines 12-17)).

In a memorandum dated May 8, 2014, the Tenure and Promotion Appeals Committee informed Dr. Hugine that they found no impropriety, inappropriate behavior, or mismanagement of the pre-tenure review process and concurred that tenure should be denied based on insufficient scholarly productivity. (Doc. 112-16, p. 187 (Wims Aff., Ex. 12)).

In a letter dated May 15, 2014, Dr. Hugine informed plaintiff that he agreed with the recommendation from the Tenure and Promotion Appeals Committee and that he had decided to uphold his original decision to deny tenure. (Doc. 112-14 (Studdard Dep., Ex. 20)). The letter reiterated that the 2014-2015 school year would be plaintiff's last. (*Id.*). Plaintiff's employment with Alabama A&M ended in May 2015. (Doc. 112-10, p. 42 (Studdard Dep., p. 161, lines16-18)).

Plaintiff did not communicate directly with Dr. Hugine regarding her FMLA medical leave. (Doc. 112-10, p. 16 (Studdard Dep., p. 60, lines 4-14)). Plaintiff does not know whether Dr. Hugine knew if she took FMLA leave. (*Id.*). Additionally, plaintiff testified that she does not have any information that Dr.

Hugine reviewed any documents that stated that she had taken FMLA leave. (Doc. 112-10, p. 16 (Studdard Dep., p. 61, lines 2-13)). Dr. Hugine does not recall anyone having brought plaintiff's extended hospital stay and medical leave to his attention. (Doc. 112-5, pp. 6-7 (Hugine Dep., p. 20, line 22 – p. 21, line 8)).

## I. Summary of plaintiff's publications

Plaintiff testified that she authored four peer-reviewed publications while at Arkansas State. (Doc. 124-18, p. 11 (Studdard Aff., ¶ 26)). (*But cf.* Doc 130, pp. 16-17 (Winn Aff., Ex. B)). Plaintiff published a peer-reviewed publication on June 19, 2009, which was after her offer from Alabama A&M, but before she began her employment there. (Doc. 124-18, p. 10 (Studdard Aff., ¶ 25)). Plaintiff admits that this publication was not written or published while employed at Alabama A&M. (Doc. 112-10, p. 34 (Studdard Dep., p. 132, lines 6-16)).

Plaintiff published a refereed publication as first chair in 2011 while employed at Alabama A&M. (Doc. 124-18, p. 13 (Studdard Aff., ¶ 35)). There is conflicting testimony in the record regarding the title of that publication, but it does not appear to be disputed that plaintiff did, in fact, publish an article in 2011. (*Compare* Doc. 124-18, p. 3 (Studdard Aff., ¶ 6) (alleging refereed publication in 2011 was titled, "Social Entrepreneurship: Managing Strategic Decision in Social Entrepreneurial Organizations") *with* Doc. 123, p. 25 (alleging 2011 peer reviewed article as primary author was entitled, "Fostering Entrepreneurship in Secondary

Education") *with* Doc. 112-10 (Studdard Dep., p. 126, lines 14-19) ("Social Entrepreneurship: Managing Strategic Decisions in Social Entrepreneurial Organizations" published in 2011)).   It is undisputed that plaintiff did not have a publication in the January 2012 to May 2013 time frame.  (Doc. 112-10, p. 79 (Studdard Dep., p. 308, line 16 – page 309, line 3); Doc. 112-10, p. 80 (Studdard Dep., p. 313, lines 14-21); Doc. 124-18, p. 3 (Studdard Aff., ¶ 8)).

From January 2012 to May 2013, plaintiff did, however, serve as a reviewer for different organizations.  (Doc. 112-10, p. 79 (Studdard Dep., p. 312, lines 4-23)).   In early 2014, plaintiff published one primary author publication entitled, "Fostering Entrepreneurship in Secondary Education"; plaintiff also had one primary author conference presentation, entitled "Exploratory Study of Black Entrepreneurial Self-Efficacy, Locus of Control and Entrepreneurial Intentions." (Doc. 112-10, p. 38 (Studdard Dep., p. 145, line 10 – p. 146, line 1)); Doc. 124-18, p. 3 (Studdard Aff., ¶ 8) ("Fostering Entrepreneurship in Secondary Education" published in early 2014)).   Both the article and the conference presentation were published and/or presented *after* plaintiff had submitted her 2013 tenure application.   (Doc. 112-10, p. 39 (Studdard Dep., p. 151, lines 1-8 (conference presentation made in February 2014); Doc. 112-10, p. 92 (Studdard Dep., p. 363, lines 11-22)).

## II.     STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).   "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party.  *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).  "[A]t the summary judgment stage[,] the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "'Genuine disputes [of material fact] are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant.  For factual issues to be considered

genuine, they must have a real basis in the record.'" *Evans v. Books-A-Million*, 762 F.3d 1288, 1294 (11th Cir. 2014) (quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)). "A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."). Even if the Court doubts the veracity of the evidence, the Court cannot make credibility determinations of the evidence. *Feliciano*, 707 F.3d at 1252 (citing *Anderson*, 477 U.S. at 255). However, conclusory statements in a declaration cannot by themselves create a genuine issue of material fact. *See Stein*, 881 F.3d at 857 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In sum, the standard for granting summary judgment mirrors the standard for a directed verdict. *Anderson*, 477 U.S. at 250 (citing *Brady v. Southern R. Co.*, 320 U.S. 476, 479–480 (1943)). The district court may grant summary judgment when, "under governing law, there can be but one reasonable conclusion as to the verdict." *Id.* at 250. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party . . . . If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

## III.    DISCUSSION

Plaintiff argues that she suffered an adverse employment action as a result of taking FMLA leave when Dr. McDaniel refused to forward her 2012 tenure application for review when it would have been evaluated under 2003 Faculty Handbook.    Plaintiff alleges that this action – along with the extension of her probationary period requested by Dr. McDaniel and Dr. Sarkar – caused her to have to submit her tenure application the next year, when it was subjected to the more stringent criteria in the 2011 Faculty Handbook.   Plaintiff asserts that these actions resulted in the denial of tenure and ultimately her termination from Alabama A&M.[6]

The remaining defendants advance two main arguments in support of their Motion for Summary Judgment.    First, they argue that Eleventh Amendment immunity bars plaintiff's claim and that no exception pursuant to *Ex parte Young*, 209 U.S. 123 (1908), applies.   Second, they argue that, even if an exception to sovereign immunity applies, plaintiff cannot show that she was retaliated against because she took FMLA leave.   The Court will address each argument in turn.

---

[6] In her amended complaint, plaintiff also alleged that she suffered an adverse employment action when her 2012-2013 faculty evaluation was falsely downgraded and when Dr. McDaniel failed to recommend her for tenure.  (Doc. 79, p. 15).  Plaintiff does not advance any argument that these actions constituted adverse employment actions in her response (Doc. 123) to the Motion for Summary Judgment, and therefore the Court finds that they have been abandoned.

## A.     The applicability of the *Ex parte Young* doctrine

Because an assertion of Eleventh Amendment immunity essentially challenges a court's subject matter jurisdiction, the Court considers this issue first. *Seaborn v. State of Fla., Dep't of Corr.*, 143 F.3d 1405, 1407 (11th Cir. 1998). Furthermore, an assertion of Eleventh Amendment immunity must be resolved before a court may address the merits of an underlying claim. *Id.*

The Eleventh Amendment to the United States Constitution states, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "Although the express language of the amendment does not bar suits against a state by its own citizens, the Supreme Court has held that an unconsenting state is immune from lawsuits brought in federal court by the state's own citizens." *Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1524 (11th Cir. 1990) (citing *Hans v. Louisiana*, 134 U.S. 1, 10 (1890)). Nonetheless, the Supreme Court has found that Eleventh Amendment immunity is not absolute. To that end, the Eleventh Circuit has discussed three exceptions to the doctrine of sovereign immunity: consent, abrogation, and under *Ex Parte Young*, 209 U.S. 123 (1908), and its progeny. It is the third exception that is at issue in this action. (*See*

Doc. 91, pp. 11 (finding that the first two exceptions are not applicable in this action)).

In particular, the Eleventh Circuit has recognized that there is a long and well-recognized exception to sovereign immunity for suits against state officers [in their official capacities] seeking *prospective* equitable relief to end *continuing* violations of federal law." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999) (emphasis in original) (citing *Ex parte Young*); *see also Papasan v. Allain*, 478 U.S. 265, 277–78 (1986) ("Consequently, *Young* has been focused on cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past, as well as on cases in which the relief against the state official directly ends the violation of federal law as opposed to cases in which that relief is intended indirectly to encourage compliance with federal law through deterrence or directly to meet third-party interests such as compensation."). "Therefore, the Eleventh Amendment bars suits against state officials in federal court seeking retrospective or compensatory relief, but does not generally prohibit suits seeking only prospective injunctive or declaratory relief." *Pryor*, 180 F.3d at 1337. The Eleventh Circuit has recognized that equitable relief in the form of reinstatement of employment constitutes prospective injunctive relief that falls within the scope of the *Ex parte Young* exception and is not barred by the Eleventh

Amendment. *Lane v. Cent. Alabama Cmty. Coll.*, 772 F.3d 1349, 1351 (11th Cir. 2014); *Lassiter v. Alabama A & M Univ., Bd. of Trustees*, 3 F.3d 1482, 1485 (11th Cir. 1993), *reh'g en banc granted, opinion vacated*, 19 F.3d 1370 (11th Cir. 1994), and *on reh'g,* 28 F.3d 1146 (11th Cir. 1994) ("To the extent that he still seeks the prospective relief of reinstatement, his claim against Covington in his official capacity is not barred by the Eleventh Amendment."). The *Ex parte Young* doctrine cannot, however, be used to compel an executive official to undertake a discretionary task. *Seminole Tribe of Fla. v. State of Fla.*, 11 F.3d 1016, 1028-29 (11th Cir. 1994).

Here, plaintiff seeks reinstatement to her position at Alabama A&M, in addition to tenure. (Doc. 79, p. 16 (demanding reinstatement with no mention of tenure); Doc. 112-10, p. 88 (Studdard Dep., p. 346, lines 3-9) (testifying that she seeks reinstatement with tenure)). Although not entirely clear, the remaining defendants appear to argue that the remedy of reinstatement is not available to plaintiff because she has not alleged her *termination* was retaliation for exercising her FMLA rights, only that she failed to obtain tenure because of same. *Cf. Lane*, 772 F.3d at 1351 (finding that, in a case where employee claims wrongful termination, a request for reinstatement constitutes prospective injunctive relief that falls within the scope of *Ex parte Young*).

At this stage and in the context of this immunity analysis, the Court, construing the facts in the light most favorable to plaintiff, will permit her claim to proceed insofar as it requests injunctive relief in the form of reinstatement. Plaintiff expressly demanded reinstatement as a form of relief in her amended complaint. Moreover, the remaining defendants have not provided any argument or law to persuade the Court to find differently at this juncture.

Whether injunctive relief in the form of an award of tenure is consistent with the *Ex parte Young* doctrine is another story. The remaining defendants have argued that the *Ex parte Young* doctrine does not apply to compel state officials to engage in discretionary acts such as tenure decisions. The remaining defendants thus argue that, even if the law permits reinstatement as a form of injunctive relief, it does not permit an award of tenure to plaintiff. The Court agrees.

For one, plaintiff has not addressed this argument or pointed to any Eleventh Circuit law providing that an award of tenure is *not* a discretionary act. *Cf. Ashokkumar v. Dwyer*, 106 F. Supp. 3d 1041, 1049 (D. Neb. 2015) (discussing *Ex parte Young* and finding that a Court cannot compel an advisor to accept a doctoral topic). Second, while reinstatement has been treated as a form of prospective relief that may be sought via *Ex parte Young*, there is an absence of case law with respect to tenure. The Court cannot find a binding case on point. Third, the facts of this case demonstrate that an award of tenure is not a ministerial decision, but is rather

a highly academic, peer-review process in which discretion is involved. (Doc. 112-5, p. 5 (Hugine Dep., p. 13, lines 3-5)). Consequently, the Court finds that, under the facts of this case, an award of tenure would be discretionary and is therefore not a permissible form of relief. *See, e.g.*, *Price v. Univ. of Alabama*, 318 F. Supp.2d 1084, 1089 (N.D. Ala. 2003) (finding that Eleventh Amendment barred an order from the court to give plaintiff a post-termination hearing).[7]

Now that the Court has decided that plaintiff may proceed with her claim insofar as it requests reinstatement, it must determine against whom the claim may proceed. While the undisputed testimony in this action indicates that Dr. Hugine has final authority to award tenure, it is not as clear whether Dr. Hugine would retain sole authority to reinstate plaintiff. In his deposition testimony, Dr. Hugine testified that he only has sole authority to hire people that serve on the President's cabinet. (Doc. 112-5, p. 9 (Hugine Dep., p. 30, lines 12-21)). Dr. Hugine testified that Dr. Wims would make the "ultimate recommendation" with respect to the reinstatement of plaintiff. (Doc. 112-5, p. 9 (Hugine Dep., p. 31, line 7- p. 32, line

---

[7] Even if plaintiff's claim would be permitted to proceed insofar as she seeks an award of tenure, such a claim would only be against Dr. Hugine in his official capacity. A plaintiff may not use *Ex parte Young* to force a state official to perform an action that he or she lacks authority to perform. *See Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1341 (11th Cir. 1999) ("[F]ederal courts have refused to apply *Ex parte Young* where the officer who is charged has no authority to enforce the challenged statute."); *Boglin v. Bd. of Trustees of Alabama Agric. & Mech. Univ.*, 290 F. Supp. 3d 1257, 1266 (N.D. Ala. 2018) (noting that the *Ex parte Young* exception only applies in instances where the state officer named as a defendant in his official capacity has the authority to enforce an unconstitutional act in the name of the state.). It is undisputed that Dr. Hugine alone has final authority to award tenure.

7)).  Dr. Hugine also testified that the "senior personnel officers are the final authority in hiring [instructors].  The only ones that I have responsibility for are those persons that report to the office of the President."  (Doc. 112-5, p. 10 (Hugine Dep., p. 36, lines 10-15)).  This conflicts to some extent with Alabama law stating that the hiring and firing of Alabama A&M staff is under the control of the President.  *See Boglin v. Bd. of Trustees of Alabama Agric. & Mech. Univ.*, 290 F. Supp. 3d 1257, 1265 (N.D. Ala. 2018) ("Alabama law is clear on its face that day-to-day University operating decisions, such as the hiring and firing of University staff, are under the control of the president, a conclusion confirmed by the Alabama Supreme Court which recently explained that '[e]mployment decisions are clearly within the job description of the president of the University.'") (citing *Ex parte Hugine*, 256 So. 3d 30) (Ala. Mar. 17, 2017)); *Ex parte Hugine*, 256 So. 3d 30, 47 (Ala. 2017), *reh'g denied* (Jan. 12, 2018) ("Employment decisions are clearly within the job description of the president of the University, and the provost is specifically designated to help the president in making such decisions. See § 16–49–23, Ala. Code 1975.").  This also conflicts to some extent with Dr. Wims's affidavit, which states that he provides *guidance and recommendation* on employment, promotion, and termination decisions.  (Doc. 112-15, p. 3 (Wims Aff., ¶ 3)).

Therefore, with respect to reinstatement of plaintiff, based on the testimony by Dr. Hugine, there is a fact issue with respect to whether Dr. Hugine alone retains authority to reinstate her or whether this authority has been delegated to Dr. Wims. Thus, the Court will permit the FMLA retaliation claim to proceed against Dr. Hugine and Dr. Wims insofar as plaintiff seeks reinstatement, as it is not clear under these circumstances whether one or both, in actuality, retain authority to reinstate her. *See, e.g.*, *Boglin*, 290 F. Supp. 3d at 1271 n.7 (noting that, had the Director of Career Development Services at Alabama A&M *been delegated hiring and firing authority by the president*, the official capacity claims against her would not be barred by the Eleventh Amendment).

The Court will dismiss the FMLA retaliation claim against Dr. McDaniel and Dr. Smith on the basis that they lack the authority to reinstate plaintiff. In other words, the *Ex parte Young* exception is not applicable to them, and therefore they are due summary judgment. *See Seminole Tribe of Fla. v. State of Fla.*, 11 F.3d 1016, 1029 (11th Cir. 1994), *aff'd sub nom. Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 116 S. Ct. 1114, 134 L. Ed. 2d 252 (1996) ("Unless one of the three exceptions—consent, abrogation, or *Ex parte Young*—applies, the Eleventh Amendment serves as a jurisdictional bar and precludes federal court adjudication over these suits.").

## B.     FMLA Retaliation

The Court will now consider the merits of plaintiff's FMLA retaliation claim.  Under the FMLA, an eligible employee may take "a total of 12 workweeks of leave during any 12-month period" because of a "serious health condition."  29 U.S.C. § 2612(a)(1)(D).  "To preserve and enforce these rights, 'the FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act . . . [,] and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." *Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1267 (11th Cir. 2017) (quoting, in part, *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001)).  Plaintiff's claim falls into the second category.

To succeed on a retaliation claim, plaintiff must show that she was intentionally discriminated against in the form of an adverse employment action for having exercised an FMLA right.  *Strickland*, 239 F.3d at 1207.  That is, plaintiff must show that the action at issue was motivated by an impermissible retaliatory or discriminatory animus.  *Id*.  As the Court has noted, plaintiff argues that she suffered an adverse employment action due to Dr. McDaniel and then-dean Dr. Sarkar refusing to forward her 2012 tenure application for review, when it

would have been evaluated under the less stringent standards set forth in the 2003 Faculty Handbook; this resulted in her having to submit a 2013 tenure application, which was subject to more stringent standards under the 2011 Faculty Handbook. Plaintiff argues that this action ultimately resulted in her tenure being denied. In response, the remaining defendants argue that, regardless of the *Ex parte Young* doctrine, plaintiff cannot prove her FMLA retaliation claim either through direct evidence or via the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

### 1. No direct evidence of retaliation

Plaintiff argues that there is direct evidence of retaliation in this action in the form of Dr. McDaniel's October 11/November 30 letters, which requested that her probationary period be extended due to the fact that she "encountered some medical complications during her pregnancy which resulted in an extended hospital stay medical leave." (Doc. 112-17, p. 7 (McDaniel, Ex. 1); *see also* Doc. 112-14, p. 43) (same).

The Eleventh Circuit "defines direct evidence of discrimination as evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (internal citation and quotation marks omitted). Direct evidence, if believed, proves the existence of a

fact without inference or presumption.  *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997).  Thus, the Eleventh Circuit has stated:

> As our precedent illustrates, "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of" some impermissible factor constitute direct evidence of discrimination. *Rojas v. Florida,* 285 F.3d 1339, 1342 n. 2 (11th Cir.2002) (quoting *Schoenfeld [v. Babbitt*], 168 F.3d 1257, 1266) (citations and quotations omitted); *see Carter v. City of Miami,* 870 F.2d 578, 582 (11th Cir.1989). If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence. *See Burrell,* 125 F.3d at 1393.

*Wilson*, 376 F.3d at 1086.

The Court finds that, even construing the facts in the light most favorable to plaintiff, the October 11/November 30 letters do not constitute direct evidence of retaliation.  On their face, the October 11/November 30 letters simply provide a reason for the requested extension of plaintiff's probationary period.  They do not, on their face, demonstrate that the request was due to a discriminatory or retaliatory intent.  *See, e.g.*, *Jones*, 854 F.3d at 1271 (finding that comments that corporate would not like timing of FMLA leave and comment that plaintiff was being suspended because corporate believed that plaintiff had abused and misused his FMLA leave were not direct evidence of retaliation); *see also Burrell*, 125 F.3d at 1393 (finding statement from CEO to plaintiff that he wanted to hire a man for a certain position because too many women filled officer positions only suggested a discriminatory motive and was therefore circumstantial, not direct, evidence).

Indeed, any retaliatory intent in making the request for the extension of the probationary period must be inferred or proven by testimony. Therefore, the Court will examine whether there is circumstantial evidence of retaliation.

### 2.    Circumstantial evidence of retaliation

When a plaintiff asserts a claim of retaliation under the FMLA and has no direct evidence of intent, the Eleventh Circuit has stated that the burden-shifting framework established by the Supreme Court in *McDonnell Douglas* applies. Thus, to state a claim for retaliation, a plaintiff must allege that (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) the decision was causally related to the protected activity. *Strickland*, 239 F.3d at 1207. If a plaintiff establishes a *prima facie* case of retaliation, the burden then shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action. *Martin v. Brevard Cty. Pub. Sch.*, 543 F.3d 1261, 1268 (11th Cir. 2008). If the employer does so, the plaintiff must then show that the employer's proffered reason was pretextual. *Id.* "Pretext is proven if it is shown that the reason was false and that the action was actually motivated by retaliation." *Yoosun Han v. Emory Univ.*, 658 F. App'x 543, 548 (11th Cir. 2016).

The parties do not dispute that plaintiff engaged in statutorily protected activity. Therefore, the Court will examine whether plaintiff can show that she

was subjected to an adverse employment action and that the adverse employment action was causally related to the FMLA leave.

### a. *Prima facie* case – adverse employment action

The crux of plaintiff's claim is that Dr. McDaniel and Dr. Sarkar held back her 2012 tenure application, which caused her to be evaluated by the more stringent tenure criteria when she submitted her 2013 tenure application. Plaintiff alleges that, along with holding back her 2012 tenure application, Dr. McDaniel and Dr. Sarkar requested an extension of her probationary period. Plaintiff argues that these events resulted in the denial of her 2013 tenure application because it was evaluated under the more stringent tenure criteria. The remaining defendants argue that these events did not constitute adverse employment actions.

In *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), the Supreme Court addressed the meaning of "adverse employment action" in the context of Title VII retaliation claim. The Supreme Court found that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id*. (quoting, in part, *Rochon v. Gonzales,* 438 F.3d 1211, 1219 (C.A.D.C. 2006)). While the Eleventh Circuit has not expressly stated whether the *Burlington Northern* applies in the context of FMLA retaliation claims, in an

unpublished opinion it has assumed, without deciding, that it does. *See Foshee v. Ascension Health-IS, Inc.*, 384 F. App'x 890, 891 (11th Cir. 2010) (assuming, without deciding, that the *Burlington Northern* standard applies to FMLA retaliation claims). Thus, the Court will do the same.

Construing the facts in the light most favorable to plaintiff, the Court finds that the holding back of her 2012 application could constitute an adverse employment action. Plaintiff testified that, during the meeting with Dr. McDaniel and Dr. Sarkar, she was told that her 2012 tenure application was going to be held back, and that she had no choice in the matter. Although Dr. McDaniel's testimony differs from plaintiff's, the Court must accept plaintiff's version of events at this juncture. Plaintiff argues that not only was her 2012 tenure application not considered, but the act of holding it back prevented the tenure criteria set forth in the 2003 Faculty Handbook from being applied to her 2012 application. Plaintiff asserts that, instead, she had to submit a 2013 tenure application the next year, which was evaluated under the more stringent tenure criteria set forth in the 2011 Faculty Handbook. The Court finds that a jury could find this to be a materially adverse employment action that would dissuade a reasonable employee from exercising her FMLA rights. *See, e.g.*, *Crawford v. Carroll,* 529 F.3d 961, 974 (11th Cir. 2008) ("In the instant case, we have no doubt but that Crawford suffered a materially adverse action in the form of the

unfavorable performance review she received (that affected her eligibility for a merit pay increase) after she complained of racial discrimination.").

To rebut this argument, the remaining defendants argue that the undisputed evidence shows that the 2011 Faculty Handbook did not substantively change the tenure criteria set forth in the 2003 Faculty Handbook. The remaining defendants argue that the tenure criteria in the 2011 Faculty Handbook simply clarified the tenure criteria in the 2003 Faculty Handbook. In short, the remaining defendants argue that the tenure criteria in both handbooks were essentially the same. The Court finds that this is an issue of fact.

The testimony by Dr. Wims that there were no substantive changes to the 2011 Faculty Handbook does not jibe with his deposition testimony that, while the Board of Trustees had approved the 2011 Faculty Handbook, they had requested additional time to fully implement parts of it. (Doc. 112-3, p. 6 (Wims Dep., p. 18, lines 12-19)). Moreover, Dr. Wims's assertion that there were no substantive changes to the 2003 Faculty Handbook does not jibe with the May 18, 2012, memoranda and December 4, 2012, memoranda sent to plaintiff reminding her to apply for tenure. The May 18, 2012, memorandum specifically stated that, while the promotion and tenure process would follow those outlined in the 2011 Faculty Handbook, plaintiff's dossier would be evaluated *under the criteria in the 2003 Faculty Handbook.* (Doc. 79, ¶ 24; Doc. 112-1, p. 17; Doc. 112-2, p. 15; Doc.

112-16, p. 155 (Wims Aff., Ex. 3); Doc, 112-16, p. 12 (Wims Aff., Ex. 6)). On the other hand, the December 4, 2012, memorandum informed plaintiff that her dossier would be evaluated *under the criteria set forth in the 2011 Faculty Handbook*. If the tenure criteria did not substantively change, it does not follow that one would need to be explicit about which tenure criteria would apply. Similarly, if the tenure criteria did not substantively change, it does not follow that why additional time was needed to implement it. Therefore, the Court finds that plaintiff has sufficiently demonstrated that she suffered an adverse employment action by having her 2012 tenure application held back. Whether the holding back of plaintiff's 2012 tenure application ultimately resulted in the denial of tenure the next year – something that the remaining defendants do admit is an adverse employment action (doc. 112-1, p. 42) – is a different consideration.

### b. *Prima facie case* – causally related

Plaintiff must still prove that the adverse employment action suffered was causally related to the protected activity. The Court finds that the causal connection is satisfied with respect to the alleged holding back of plaintiff's 2012 tenure application. "Generally, a plaintiff can show the two events are not wholly unrelated if the plaintiff shows that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010). Here, it is undisputed that Dr.

McDaniel was aware of her FMLA leave at the time that he allegedly held back her 2012 application. Additionally, in the October 11/November 30 letters, he expressly requested an extension of plaintiff's probationary period due to her extended medical leave. Moreover, whether plaintiff's 2012 tenure application was held back is a disputed fact, along with the circumstances behind the requested extension of plaintiff's probationary period. Thus, the FMLA leave and the holding back of the 2012 tenure application are not wholly unrelated.

On the other hand, the Court disagrees that the denial of plaintiff's tenure was causally related to her FMLA leave. It is undisputed that Dr. Hugine was the sole decision maker regarding tenure. There is simply no evidence, other than plaintiff's own speculation, that Dr. Hugine was aware of plaintiff's FMLA leave. Indeed, Dr. Hugine testified that he does not recall knowing about it, and there is not any probative evidence indicating that he did. Even plaintiff testified that she does not have any information that Dr. Hugine reviewed documents indicating that she took medical leave or otherwise knew of it. *See, e.g.*, *Rudy v. Walter Coke, Inc.*, 613 F. App'x 828, 830 (11th Cir. 2015) ("If the evidence shows that a decision maker was unaware of an employee's request to take FMLA leave at the time of the decision to terminate the employee, the employer is entitled to summary judgment.").

To overcome this obstacle, plaintiff argues that Dr. McDaniel's discriminatory animus can be imputed to Dr. Hugine under a "cat's paw" theory. "[D]iscriminatory animus may be imputed to a neutral decision maker under a 'cat's paw' theory if (1) a supervisor performed an act motivated by animus that was intended to cause an adverse employment action, and (2) the act was a proximate cause of the adverse employment action." *Rudy v. Walter Coke, Inc.*, 613 F. App'x 828, 830 (11th Cir. 2015). "A plaintiff may establish causation under this theory if the decision maker either followed another supervisor's biased recommendation without independently investigating the complaint against the plaintiff or conducted an independent investigation but relied on facts provided by the biased supervisor." *Id*. at 830-31. The Eleventh Circuit has not yet determined whether a plaintiff may proceed under a cat's paw theory in the FMLA context. *Id*.

Even under a cat's paw theory, however, plaintiff cannot show that the holding back of her 2012 tenure application by Dr. McDaniel proximately resulted in the ultimate denial of her tenure by Dr. Hugine in March 2014. First, the undisputed evidence is that Dr. Hugine had sole power and discretion to award or deny tenure. Second, when plaintiff submitted her 2013 tenure application, she did so directly to the Promotion and Tenure Committee of the College of Business and Public Affairs, which recommended her for tenure; plaintiff's 2013 tenure application did not go through Dr. McDaniel. Plaintiff's 2013 tenure application

was then sent to the university-wide Promotion and Tenure Committee, which did not recommend her for tenure due to "insufficient number of publications." (Doc. 112-16, p. 169 (Wims Aff., Ex. 8)). Dr. Wims then independently reviewed plaintiff's 2013 application for tenure and did not recommend her for tenure. The rationale for denial of tenure was lack of refereed, juried, and/or peer reviewed scholarly productivity as first author during the probationary period. Plaintiff does not allege a discriminatory animus on the part of the university-wide Promotion and Tenure Committee or Dr. Wims. Plaintiff appealed the denial of tenure by Dr. Hugine, expressly asserting that the tenure criteria in the 2003 Faculty Handbook should have been applied to her application. The appeal was then reviewed by the Tenure and Appeals Committee, which found no impropriety, inappropriate behavior, or mismanagement of the pre-tenure review process and concurred that tenure should be denied based on insufficient scholarly productivity.

In sum, the link between any alleged discriminatory animus by Dr. McDaniel with respect to the holding back of the 2012 tenure application and the ultimate tenure decision by Dr. Hugine that was upheld on appeal is too attenuated and based on mere speculation. *See, e.g.*, *Pennington v. City of Huntsville*, 261 F.3d 1262, 1270 (11th Cir. 2001) ("Where a decision maker conducts his own evaluation and makes an independent decision, his decision is free of the taint of a biased subordinate employee."); *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328,

1332 (11th Cir. 1999) ("To the contrary, the evidence shows that the Board has the sole power and discretion to terminate police officers, that its members are appointed by the Governor of Alabama, that it conducted a three day hearing to investigate the charges, and that during the hearing Stimpson was represented by legal counsel and was allowed to put on defense evidence and witnesses . . . . We need not announce a bright line at which an independent investigation becomes a rubber stamp to resolve this case because the record before us does not contain any hint of a cat's paw arrangement."). Thus, there is simply no evidence of a cat's paw arrangement between Dr. McDaniel and Dr. Hugine.

Plaintiff attempts to connect the ultimate tenure denial decision with the holding back of her 2012 tenure application by arguing that, had she been evaluated under the less stringent standards in the 2003 Faculty Handbook, she would have been granted tenure. Again, the Court finds this speculative in nature. While the Court has found that, viewing the facts in the light most favorable to plaintiff, the tenure criteria in the 2003 Faculty Handbook were less stringent, this does not automatically mean that plaintiff would have been granted tenure had her 2012 tenure application been considered. In fact, Dr. McDaniel testified that he would have not recommended her for tenure in 2012-2013, when she submitted her 2012 tenure application.

Consequently, the Court finds that plaintiff has only shown a *prima facie* case of FMLA retaliation with respect to her claim that Dr. McDaniel held back her 2012 tenure application, but not with respect to the ultimate denial of tenure.[8]

### c.    Legitimate, non-discriminatory reason

The burden shifts to the remaining defendants to provide a legitimate non-discriminatory reason for the alleged holding back of plaintiff's 2012 tenure application. Dr. McDaniel has testified that he offered to request an extension of plaintiff's probationary period to permit her more time to engage in scholarly activity, and that he did so as an accommodation to plaintiff. While the Court understands that plaintiff disputes this, it simply considers this as the proffered legitimate, non-discriminatory reason. There is evidence in the record to support Dr. McDaniel's assertion. In the 2011-2012 evaluation, Dr. McDaniel encouraged publications. Indeed, plaintiff acknowledged Dr. McDaniel's desire for more publications. Even under the 2003 Faculty Handbook, publication in referred journals, scholarly books, chapters in scholarly books, and research reports was required for tenure. It is undisputed that, at the time of her 2012 tenure application, plaintiff had only produced one refereed publication as first chair in 2011 and while employed at Alabama A&M. Thus, the Court finds that the there

---

[8] In their briefs, the parties address whether plaintiff was treated differently than similarly situated faculty with respect to the award of tenure. Because the Court finds that there is no causal relationship between plaintiff's FMLA leave and the denial of tenure, it will not address these arguments.

was a legitimate non-discriminatory reason for the holding back of the 2012 tenure application and tandem request for an extension of the probationary period. Therefore, plaintiff must show that this proffered legitimate, non-discriminatory reason was pre-textual.

### d.  Plaintiff cannot demonstrate pretext.

Plaintiff argues that the holding back of her 2012 application and request for probationary extension in order to permit her to increase her scholarly activity was, in actuality, retaliation for her taking FMLA leave. First, plaintiff points to Dr. McDaniel's negative change in attitude when she was pregnant and setting her class time so that she would be walking to her vehicle after dark. However, these things occurred before plaintiff's FMLA leave.

Second, plaintiff cites the formal reprimand for her non-attendance at a QEP event shortly after she returned to work; Dr. McDaniel's added handwritten comment on her 2011-2012 evaluation that she had not attended a conference agreed upon as a goal for 2012-2013, when the evaluation did not cover that time period; Dr. McDaniel changing her 2012-2013 faculty evaluation after they had already agreed on the score; and inserting himself into her tenure appeals process by writing an unsolicited letter. These events, however, do not speak to whether Dr. McDaniel intentionally discriminated against her for taking FMLA leave via the holding back of her 2012 tenure application. *See Rudy v. Walter Coke, Inc.*,

613 F. App'x 828, 830 (11th Cir. 2015) ("To state a claim for FMLA retaliation, the plaintiff must show that the defendant intentionally discriminated against him because he engaged in statutorily protected activity."). Instead, they are conclusory allegations and assertions. *See Bailey v. City of Daytona Beach Shores*, 560 F. App'x 867, 871 (11th Cir. 2014) ("To survive summary judgment, specific facts showing pretext are needed; '[m]ere conclusory allegations and assertions will not suffice.'" (quoting, in part, *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081 (11th Cir.1990)).

Third, plaintiff argues that the requested extension of her probationary period constituted pretext because the probationary period under the 2011 Faculty Handbook was four years. That is, plaintiff argues that, while the *tenure criteria* in the 2003 Faculty Handbook were in effect when she submitted her 2012 tenure application, the four-year probationary period found in the 2011 Faculty Handbook – not the three-year probationary period in the 2003 Faculty Handbook – should have applied to her at that time. Because plaintiff claims that she was already subject to a four-year probationary period, there was no need for Dr. McDaniel and Dr. Sarkar to request an extension of her probationary period. Plaintiff thus argues that it was an unnecessary request; therefore, rather than purportedly helping her, Dr. McDaniel and Dr. Sarkar were ensuring that she would be subject to more stringent tenure criteria when she applied for tenure the next year, in 2013.

While the record is not clear as to why the remaining defendants were acting under the assumption that plaintiff was subject to the three-year probationary period, it appears that everyone, including plaintiff, was operating under this assumption. On May 18, 2012, Dr. Wims sent plaintiff a memorandum reminding her that she was "to apply for tenure this upcoming academic year 2012-2013." (Doc. 112-2, p. 15; Doc. 112-16, p. 155 (Wims Aff., Ex. 3)). Plaintiff does not allege that Dr. Wims had any retaliatory animus toward her. According to plaintiff, she responded to the memorandum by submitting a tenure application. There is nothing, other than conjure and speculation, to indicate that the application of a three-year probationary period (which resulted in a request for an extension) to plaintiff at the time was nefarious or done with the purpose of making sure that she had more stringent criteria applied to her tenure application submitted the next year.

Fourth, while not argued by plaintiff, temporal proximity does not help plaintiff establish pretext either, as around nine months passed between the end of her FMLA leave and the holding back of her 2012 tenure application. *See, e.g., Scott v. Honda Mfg. of Alabama, LLC*, No. 1:06-CV-1717-VEH, 2007 WL 9711442, at *10 (N.D. Ala. July 30, 2007), *aff'd sub nom. Scott v. Honda Mfg. of Alabama, LLC.*, 270 F. App'x 814 (11th Cir. 2008) ("Scott is similarly unable to

demonstrate pretext through the temporal proximity of her FMLA leave request in October and the decision to deny her leave request and fire her in December.").

In sum, to show pretext, "a plaintiff must come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Barker v. R.T.G. Furniture Corp.*, 375 F. App'x 966, 968 (11th Cir. 2010) (internal quotation marks omitted). Plaintiff has failed to produce any such evidence here. Therefore, the Court will grant summary judgment to Dr. Hugine and Dr. Wims as well.[9]

## IV.    CONCLUSION

For the reasons stated, the Motion for Summary Judgment (Doc. 112) is GRANTED.

A final judgment will be entered separately.

---

[9] The Court requested that the parties brief the issue of whether injunctive relief, in the form of reinstatement, would be available to plaintiff if she could establish a *prima facie* case of retaliation with respect to the alleged "holding back" of her 2012 tenure application. Because the Court has found that plaintiff cannot show pretext, it declines to make a ruling on this issue. The Court observes, however, that even if plaintiff were to prevail, it appears that the proportionate remedy would be for plaintiff's 2012 tenure application to be considered under the 2003 Faculty Handbook; however, this would not automatically result in plaintiff being granted tenure (and thus a permanent position at Alabama A&M). How this would ultimately square with plaintiff's requested relief of reinstatement and *Ex parte Young* and its progeny is an issue the Court need not consider today.

**DONE** and **ORDERED** this May 21, 2019.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE